Thank you. We're having your argument in our third case, United States v. Cantrell. May it please the Court, my name is Brian Kornbrath. I represent Mr. Cantrell. Both myself and Mr. Warner mistakenly believed the audience was here for this, the third argument, before the Court. But we'll proceed nonetheless. You better call them back. I know they're going to be missing the main show. Of course, the issue is whether or not the Court clearly erred in posing a two-level increase for the firearms enhancement found under U.S. Sentencing Guidelines, Section 2D1.1, B2. I'm sorry, B1. There are four acts of misconduct in this case. Three were charged and one was uncharged. And just to briefly go over those in a factual scenario, the first charged act of misconduct in Count 1 of the indictment took place in Beverly, West Virginia on March 11, 2015. Cantrell possessed 24 grams of meth with intent to distribute. Law enforcement found $1,019 in the room that he was sharing with the woman. The next charged act was Count 2 of the indictment, September 29, 2015, in Elkins, West Virginia. There was a distribution of about a half gram of methamphetamine for $150. The third act of misconduct is the uncharged act of misconduct. It took place outside the district in Charleston, West Virginia, December 27, 2015. There were two people associated with a vehicle that was investigated. There was 3.08 grams of marijuana found by the police, an odor of marijuana in the car, a rifle, a shotgun, two pistols. There was a statement of ownership of the weapons by the woman, Sarah Barrickman. And, of course, Cantrell had about $5,000 cash on him. The last act of misconduct was Count 3 of the indictment, back up in the northern district of West Virginia in the town of Mill Creek. Cantrell was found with an unknown quantity of meth. The record is unclear. He was charged with possession with intent to distribute, and notably he had $11,785 on him at the time. This is not a conspiracy case, so we have three distinct charges here, which clearly affects the temporal analysis. We believe that the district court judge clearly erred for several reasons. At sentencing, the district court acknowledged that there's a difference between marijuana and methamphetamine, but it doesn't make a difference. In the judge's own words, there was drug distribution in both places. I don't think the record supports that. It was a user quantity of drugs. It was an odor of marijuana use that the police located. There wasn't distribution in Charleston, West Virginia, in December of 2015. The judge also said that the misconduct in Charleston bookended some of the counts in the indictment. I'm not sure what that means. It means they're on either end. But again, it's not a conspiracy where it's a continuous conspiracy. You didn't say it was. You just said they bookended it. Yes. One on one end, one on the other. We have the December misconduct. There was a sale of a... One on one end and one on the other. I agree. Can you cite any case in which the police found a gun near a different drug, a recreational amount of the drug, and the court didn't apply the enhancement for firearms? I cannot. In other words, any cases at all like this that you can rely on. Nothing comes to mind, but... Or that the government can rely on, frankly. No, but in those cases where there is an enhancement... Yeah. It's almost perfectly clear because of the amount of the drug or the way it's packaged that it's a distribution type of case. Here we're talking about three grams of marijuana that is clearly a user quantity, and clearly it was being used because the police smelled the odor. Right. Right. So it had that one charge all by itself. I don't know that you could charge distribution with the gun, right? I don't think so. But we do have these other charges bookending it that do involve distribution, and we have a whole bunch of guns in the middle. Yes, but if you look at Cantrell's practice, whenever he's caught by the police, he has large quantities of cash and drugs and no weapons. But when you get to Charleston, West Virginia, there are weapons present. I can see that. He had this girlfriend who says they were hers. Yeah, she basically said, I didn't trust the judicial system in Randolph County, so I was moving my guns to Fayette County. That's what she told the police in a written statement. Your client doesn't contest constructive possession of those weapons, does he? No. In fact, he was charged in Charleston. But it may be charged, but I said, does he contest constructive possession of those weapons? I don't think he can, Judge. He was in the car with a woman. They were accessible. So, yeah. The point is, I don't know about that he can, but he doesn't. But his story, the story is they're the girlfriend's weapons. They're his. They're constructively available to him. Right. But, I mean, they're sharing a vehicle. Does he have the power to grab a weapon? Of course, he has the power, so constructive possession would be there. It's whether or not it's tied to drug dealing activity. I know the Court's going to be concerned about the amount of cash. I just have several points I want to point out. One is, in paragraph 102 of the pre-sentence report that's been filed in the record under seal, Cantrell did tell probation that he was receiving cash payments over time for labor tasks that he was doing in the area. I would note that the plea agreement in this case between Cantrell and the government involved the forfeiture of two sums of money. The government clearly could have sought the forfeiture of the December proceeds as drug proceeds. They never did. They never did. Perhaps even the government had a question of whether that was actually drug proceeds in Charleston, but that wasn't forfeited. Those are there in the record. This is not in the record, but from 15 years' experience in our district, there's a fair population that tries to live off the grid on a cash-only economy. It's not incredibly unusual for someone to have that amount of money on them. Because it's not part of the charge of defenses, it's got to be a relevant conduct analysis under 1B1.3 of the guidelines. This Court has to decide whether it's a common scheme or plan or the same course of conduct. It's Cantrell's position that it's neither. Application Note 5B in that particular guideline section talks about common scheme or plan, and it talks about common accomplices, common purposes, similar modus operandi. I don't think those are present given the December facts. Same course of conduct. Is it similar to the offenses charged? Is it regular and repeated? Is the time interval between the offenses close? I think those are suspect, too. To my knowledge, the Court never even referred to the statement from Sarah Brickman, where she said, look, these are my weapons, and I'm just briefly moving them from one location to another. That could have been used by the Court, but it wasn't touched upon. I have seven minutes to go, but unless the Court has any questions, I'm going to stop at this point. No, we appreciate your argument. Thank you very much. Thank you. May it please the Court, good morning. My name is Steve Warner from the Northern District of West Virginia on behalf of the government. And, of course, the government didn't, the U.S. Attorney's Office didn't ask for the two-level enhancement, but it is our position that the District Court should not clearly err in finding that the Charleston conduct, drug distribution was relevant to the course of conduct in the indictment. I would describe the course of conduct like this. In March of 2015, the defendant had meth, cash, and marijuana. In September of 2015, he had meth and cash. In Charleston, he had cash, guns, and marijuana. And then in March of 2016, he had cash and methamphetamine. 1B1.3 Application Note 5B says there are three factors to look at and to help a District Court assess whether it's the same course of conduct. That's similarity, regularity, and timing. And the District Court wins on the last two. Certainly, the timing is right. It's bookended. The regularity is in the Court's favor, too, because it's four distributions in one year. So the question is, how similar are they? What if there had been no marijuana found in the... Sure. But there were drugs in the middle? I'm so glad you asked that because I did find a case that might be helpful. It's a 404B case. It's not a guideline case. It's a 404B case, United States v. Ward. W-A-R-D. So tell us about it. Oh, sure. In any case, in United States v. Ward, a gun and cash was found in the defendant's apartment. And so the defendant moved to exclude that as irrelevant because there was no other evidence. He argued that the gun and cash was relevant to his drug dealing behavior. The Court let it in, finding that it was. And then this Court held that it was not clearly error for the District. So there's a little relevance. I'm sorry. I'm not seeing a parallel. I'm asking for a situation exactly like we have here, but there is no marijuana found in the December... whether there was December and the guns found, remember, and the girlfriend's guns. Has there been no drugs at all found during that arrest? Well, it would be my position that the Court still didn't clearly err because the course of conduct of this defendant was to make money by selling drugs. He wasn't just supporting his habit, $5,000, $12,000, and no... There were no drugs. You do understand my hypothetical. There are no drugs found in my hypothetical. But he had the cash. Well, you can use cash for other things, too. But he also had guns illegally, too. So I agree they could go both ways. We didn't pursue it, but we think the Court did not clearly err because it can go both ways. Do you think that's because it's cash, which you get, and he's had, in other instances, and guns, according to the Fourth Circuit? A gun is a tool of the trade, especially this kind of guns. Yes, sir. So while you didn't press it, you don't think it's clear error for the Court to have applied it in this context? That's correct. If there was error, is there any indication that that error would have been harmless? Well, he got a two-level enhancement on the guidelines because of the Court's findings. So it wouldn't be harmless. I'm just going to the point that both guidelines, even if the two levels are not applied, the 70 is within the range of the sentence that still could be imposed. In other words, the judge could go back and give him the same sentence. So is 70 months within two levels down on the guidelines? I'd have to look at my guideline chart to know. Well, let's assume it is. Does that make a difference? I would argue that it's harmless error, but I can't cite the case to say that. The judge ended up cutting you a break because you didn't do that instruction enhancement. Anyway, don't worry about it. You don't think it's not. Yes, sir. Well, so I think the argument is simple. It is our position. It's not clear error. Is there anything linking the car to the meth distribution? No, ma'am. No. It's his car. Right. He did the meth distribution. I will throw this out as well. The girlfriend's statement that she was transporting guns from Randolph County to Pocahontas County doesn't make any sense because Conovo County is way out of the way of that transport. Randolph County, Pocahontas County, and then Conovo County geographically doesn't make sense. Well, I think it's odd that you're relying on geography, which seems to me is one of their points that this middle, this December transaction took place in the southern district of West Virginia and the others took place in the northern district. Yes, ma'am. Because in the defendant's brief, they made that comment. But here's the thing. When you deal with methamphetamine in rural West Virginia, and the fact that it's almost pure methamphetamine is important. This isn't mom-and-pop meth labs. This is imported methamphetamine. It travels in interstate commerce. There's no such thing as a drug dealer in central West Virginia that sells crystal meth who doesn't travel to a city to re-up or to some other place to re-up. Well, he might not be traveling to the northern district of West Virginia. Atropolis, though, it is. He could be going over to... Charleston is the most... Or Ohio. Excuse me. Or Virginia. Go ahead. Geographically speaking, Charleston is the most sensical place to go to re-up. If you look from that part of Randolph County, you could go up to Morgantown or Pittsburgh, but it's probably the same to drop down into Charleston. Do you think drug dealers know or care about our jurisdictional venue lines? They don't care about one district to the other, do they? Or maybe they do in West Virginia. Definitely, I agree, Your Honor. I was asking a question. They just go sell drugs where they can sell drugs and where they know people and where they want to establish new territory. They don't really care about where our lines run. And they do have to travel. They have to go somewhere to re-up, whether it's Virginia or Pittsburgh or Columbus or Charleston. The traveling within 120 miles is a morning trip, and that's what they do. Pittsburgh and back overnight, Columbus and back, Charleston and back. That's fairly normal, the geography. So he had the cash. Was he going to buy drugs? I don't know. Was there a hearing here? Excuse me. Was there a sentencing hearing? No evidence was taken. The court adopted the PSR in its entirety. The government didn't make an argument for this enhancement, is that right? No, quite frankly, we didn't ask for it. Frankly, it's not good business to reach an agreement and then something outside the agreement comes up. We respect the court, and we think it was in clear error, but we didn't argue for it. I understand. But the way sentencing goes, your agreement doesn't bind the court unless the court accepts it. It used to be 11C. I don't know what it is anymore. But as part of a misconception I've seen some courts have had, as I've read circuit decisions, the government enters an agreement with the defendant if they decide to, but that doesn't bind the court on questions of acceptance of responsibility or enhancements or anything, does it? That's exactly correct, and even the plea agreement in this case specifically said the court is not bound by these. No, it was just explaining why you, in good faith, didn't make the argument that was not in the plea agreement. Yes, Your Honor. But it does have some error on it. I mean, after all, we've got a prosecutor. The judge is not a prosecutor in this case, and he's going upon what's before him. If you've got the government standing before him, I don't want him to open his mouth on it, say anything about it. It seems to be a limit. I understand the basis is here, and whether it's clear error is a whole different question. But just in terms of the way in which you stated, you didn't even buy in one way or the other. In both cases, the judge, our agreement says, lower the end of the applicable guideline. That's what we did. It completely got out of that discussion. And that's what we did at sentencing. My friend and colleague covered it. In both cases, it seems like somebody ought to say something. I mean, if you've got evidence like what you have here, it's not like he had the guns in the course of this conduct at all. It's separate. And it seems like somebody ought to say something about, well, the connectivity and argue for what it is, other than a pre-sentencing report, probation officer. But, you know, leave it alone. I don't know what your practice is. I remember when I would sentence people, sometimes I would think an enhancement was appropriate and the government would have a plea agreement. And, you know, during the process of the hearing, maybe it wasn't oral hearing in this case, you would ask, what about that? And I would ask the government. The government would go, Your Honor, we do not want to make a comment on that because we have an agreement that this is what we think is appropriate. And so we aren't going to add our argument to why that should be, you know, that enhancement should be given. I don't know, is that a practice that you all do sometimes? Well, I think the colloquy on the record is very close to that. The district court did ask whether it's in the plea agreement. And my friend and colleague covering this for me, rightfully, as I asked her to, said, Your Honor, we stand by the plea agreement. And the court said, well, there's no term in the plea agreement about the two levels. And she just said, well, Judge, we stand by the plea agreement. Particularly where the evidence is close. I mean, you've got a situation right here. There's a reason you probably didn't go after the two levels. You might have come to the conclusion it's not something we should do. But, of course, the court can go a different way. But it just seemed appropriate. This is a case. Somebody should have said something. It seems like maybe one way or the other. Or, I mean, I guess it could have been negotiated in the plea agreement. Could have been. We sometimes do that. There's no question in our district. I know the guidelines want resolutions in the plea agreement. And if there's a dispute, let it be pointed out. And sometimes, I've seen, sometimes the government go, we will not argue for. Yeah. We will not argue for an enhancement. You see that in the plea agreement. We definitely do that sometimes. I understand because when prosecutors strike arrangements with the police authorities and with the criminal defense lawyers and the defendant, and everybody thinks it's a pretty fair deal on the facts, they just, that's their agreement. And we've come to this agreement, given up stuff we could have had and what we might have charged, and we'll take this agreement. So the government sometimes, I have seen, will just say, we just will not argue for any further enhancements on that gun or whatever. And you've seen that, I'm sure. You know what troubles me about this? If the defense lawyer had been on his toes, done his job on this right here, the likelihood is it would have been an agreement because there's no inclination on the government to go for a two enhancement. They basically got this plea agreement. They're ready to go with it. And this is the kind of thing that happens to defendants who do not have the sophistication of the lawyer, that those who perhaps have greater means of sophistication would have. And so you get in this situation where, well, the report says it, and it's here, and the judge can make the commitment, I'm going to stay out of it. But the I'm going to stay out of it tells you the government doesn't have an interest in it. If the government didn't have an interest in it, that's something you could have gotten from a plea agreement. And that's a shortcoming, but it's a failing of the system when we have a system where individuals are being sentenced to greater sentences because the system allows for this to happen. Surely we can wax eloquently about the jurisprudence of it, but the fact of the matter is the reality is that clients of means with sophisticated lawyers, this would not have happened. Because they would have seen this thing right up there on the front of it and said right then, and the government, from what you're telling me right now, would have said fine, put it in there. But you don't need to comment on that. I'm just saying that's what it kind of feels like when we have these kind of cases coming up. And for the government to get up, having made a plea agreement with someone, it tells you what they're interested in and what they're not interested in, and what's available and what's not available. And it's clear to me that the defense counsel, this is something that was on the table, could have gotten, now it's in the hands of the judge, and there's no plea agreement with the judge, so he can do what he wants to do. But that takes it out of the bailiff where we are. Well, thank you for your comments, Judge. I can tell you that both me and my colleague, Steve Jory, was the attorney back then, and he was the U.S. attorney back in the 1980s. Both of us have plenty of experience. I've been in many cases like this. I actually sat on the defense side, and I knew exactly how this thing goes with the prosecutors over there. And, you know, you've got the judge up there, and when you're in these little small courtrooms, we can sit up here on the appellate court and take the view that, well, this is the way the law is and how it goes, and we can be the trial judge and do it. But the reality is the work is done in that hole there between that defense counsel and that prosecutor. And that end result depends on how that work is done as to whether that court is going to have that discretion or ability to do that. That's all I'm saying. I respect that. And that's troubling. Those people should be treated the same. Thank you, Your Honor. Do we have any more questions? No. Thank you very much. Several points on rebuttal. For the record, it wasn't Pocahontas County that Barrickman was going to take the weapons to. Her statement says Fayette County, and that matters because Charleston is a midway point for Fayette County. You can go through there. I agree with Judge Shedd. Drug defendants don't look at jurisdictional venue. It doesn't matter to them. But Cantrell's a good old boy from Randolph County, West Virginia, who doesn't do any drug dealing whatsoever except in Randolph County, West Virginia. That's what the indictment stands for. Each and every count was in Randolph County, West Virginia. I disagree with the government when they claim that Charleston, West Virginia, is some type of source city. All of that is interesting, but your standard review being clear error, with the deferential standard review, everything you can say can be absolutely true. It just doesn't seem to empower us to do anything more than just to say, okay, we've got to go with the judge on this. It doesn't give us the authority to take that away from clear error. Our strongest argument against that position is the district court judge's own words. There was drug distribution in both places. That's clear error. I understand the court's going to be concerned about those cases that tie drugs and guns together, but it's a slippery slope. Are we talking about crumbs of marijuana in the ashtray? Are we talking about three grams that's clearly a user amount, and there's an odor of marijuana found by the police? Three grams is not distribution. Drug distribution in both places is clear error. That's our point. Of course, he could have been relying on the fact that there was some drugs, not distribution amount, but that there were guns and money, which are, as my colleague has said, indicia of... I understand. I mean, in a drug distribution scenario. I was just trying to give you every benefit of the doubt. If we could really say that was clear error. Okay. Thank you very much. We will ask the clerk to adjourn court, and then we'll come down and greet the lawyers. This honorable court is adjourned until tomorrow morning. God save the United States and this honorable court.
judges: Diana Gribbon Motz, Dennis W. Shedd, James A. Wynn Jr.